Brandon J. Harrison, Judge, dissenting. Today the majority opinion affirms a summary judgment against a worker who received an electric-shock injury. To affirm the dismissal with prejudice of Robert Duran’s complaint against Southwest Arkansas Electric Cooperative Corp., the majority’s opinion reverses the polarity of this state’s- summary-judgment standard to view the proof against Duran, not for him. And it doesn’t address undisputed testimony from the company’s ; own employees. lnBefore parsing the circuit court’s ruling that Southwest owed no duty in tort to Duran in the circumstances — and this court’s mistaken ■ decision to affirm it— more of this case’s story must be revealed. We are duty-bound to conduct a plenary review of the case record and view all the proof in the light most favorable to Duran, the party who opposed the summary-judgment effort. Additional Material Facts A broad overview of the facts goes like this. In 2009, Robert Duran received an electric-shock injury while working near an energized, pad-mounted electrical transformer that Southwest owned. The parties do not dispute that Duran was Charles Glover’s employee, that he received workers’-compensation benefits after the injury, and that he is statutorily barred from suing his employer in tort. The parties also agree that Duran was an employee of an independent contractor (Glover). Glover has had an established, independent-contractor relationship with Southwest since the 1970s. When the injury occurred, Southwest and Glover had a written agreement in place titled “Special Services Contract,” which generally outlined the work Glover was to do for Southwest.[3] On the day Duran was shocked, Glover had received a work order from Southwest to dig a utility trench at a home in Miller County, (The majority largely bases its holding jTi,on the parties’ contract and the work order, .but the documents.can’t bear the legal importance placed upon them.[4]) The utility trench’s intended path from the house ■ to the electrical transformer was determined and staked by Southwest’s engineers, Glover was then tasked to dig a trench and install conduit, which Glover did, using his employee, Duran. The problem occurred when Charles Glover opened the transformer box for Duran and Duran attempted to push the conduit pipe into the energized transformer. At some point Duran either touched, or came too close to touching, an energized part of the transformer and received an electric shock. All the parties agree, however, that Duran received an electric-shock injury while Working on Southwest’s transformer. Everyone also agrees that Glover and Duran were supposed to be working on the transformer the day they did so. With these basic facts in. mind, recall that the circuit court specifically held that Southwest “owed no duty to provide [Duran] with a safe work environment or to warn him of the dangers of working near an energized transformer, particularly when working 11snear an energized transformer was an integral part of the work Glover was hired to perform, and where [Duran] was alreády admittedly aware of the hazard at issue.” The task now is to fully appreciate the circuit court’s fact-based ruling that “working near an energized transformer was an integral part of the work Glover was hired, to perform[.]” The majority essentially agrees with this statement. To judge the statement, however, we must delve into the deposition testimony that was introduced into the case — a great deal of which the majority opinion omits. Robert Duran According to Duran,’ Glover’s “on-the-job training” led him to believe that he (Duran) was allowed to work on energized, pad-mounted transformers. Duran said that Glover had never taught him that he (Duran) was supposed to call Southwest so the company could de-ener-gize an energized pad-mounted transformer before opening the transformer’s secured cover. Though a Glover employee once told him not to touch anything inside an energized transformer or “it will get you,” no one from Glover’s business had trained him “on the anatomy of a pad mounted transformer” or explained the difference between energized and nonen-ergized transformers. When questioned during his deposition, Duran agreed that he was “obviously not a qualified lineman.” Speaking about the day he was shocked, Duran said that the transformer box was “extremely loud,” , and it was humming “louder than [he] had ever heard it.” He knew that the transformer was “high-voltage.” Duran also acknowledged that Southwest could shut |uoff electricity to the transformer and that a Southwest employee had in fact come “once or twice” when he was working on a job for Glover and de-energized the transformer. Charles Glover Glover testified during his deposition that Duran spent “lots of time” running the ditch-digging equipment. Glover also said that he tells “everybody” not to touch anything that “could be hot,” but that he and his employees “touch [all transformers] when [they] are not energized.” When asked specifically about the injury itself, Glover testified that Duran said his back was hurting so “instead of bending over and pulling that pipe backward!,] ... he (Duran) reached over in [the transformer].” When questioned how he knew that Duran touched the transformer Glover replied, “It looks obvious.” Here , is part of the deposition colloquy: Q: It looks obvious to you? But he never told, you that, right? A: He never told me what? Q: That he touched something inside there. A: I am not sure if he ever did. Q: So it looks obvious. What tells you he touched something? If he didn’t tell you that, and if it looks obvious from looking' at the photographs— A: He did tell me that he reached in there[.] Glover also let it be known that he had held the keys to Southwest’s transformer boxes “for thirty something years” but no longer has permission to access the transformers since Duran’s accident. litiQ: Do they [Southwest] know you are ■ out there using that key to open up ■ these transformers? Is that a yes? A: Yeah. Q: And, they are okay with that? [[Image here]] A: They are not okay with it.... I don’t open any of them [transform- ' ers] any more. Q: When did that change? After this accident? A: I guess. Glover further agreed that, before the accident, he did not have to call Southwest and ask that its personnel come to a work site and ensure that a transformer is de-energized and safe. But now he must do so. HAROLD CRANE (SERVICE FOREMAN FOR Southwest) A Southwest service foreman named Harold Crane testified that he had known Charles Glover since the early 1970s and that if a transformer was “dead” then Glover would pull the wire into it; but if “anything [was] hot in there,” then Southwest would do it. Southwest’s service foreman agreed that it was “absolutely” necessary when dealing with “hot connections” that a person be “qualified, trained and [have] appropriate equipment and tools to make sure nobody is harmed and nobody is exposed to unnecessary risk of harm.” Another part of the proof that the majority opinion passes over is that, according to Crane, the only people who are to have the special keys and wrenches that open Southwest’s |1fitransformers are “engineers, linemen, servicemen, District Managers, in other words, [Southwest] hierarchy.” He didn’t know “of anyone else that had them and [he didn’t] know of any reason that they [people like Glover and his employees] would have had them.” Only “qualified people” could have keys. And to be “qualified,” a person should be a “lineman.” Neither Glover nor Duran is a lineman. Here is Crane on the transformer-access point: Q: What you are telling me and what I hear you saying is this key, this wrench was never supposed to have made it into the hands of Glover Construction or any construction company? A: As far as I know. [[Image here]] Q: Before this accident happened, [Southwest] was aware that Glover was going around, whenever they would do work like they were doing when this accident occurred, was opening and accessing those transformers without anybody from [Southwest] being present, right? A: Somebody had to know it. Q: So [Southwest] knew it? A: Yes. Q: And allowed it to continue anyway? A: Yes. Q: That shouldn’t have been happening? A: In my opinion, not. |17Southwest’s service foreman also testified that, after the accident occurred, someone came in and said that “this is not going to happen again, no contractors are accessing these transformers [and] we are going to enforce this.” Willie Keener (Southwest investigator/manager) Willie Keener, an investigator/manager at Southwest, said during his deposition that Southwest learned it had a “contractor who was doing some things that they are not legally able to do or supposed to be doing.” Keener explained that the National Electrical Safety Code — and some state and federal laws — prohibited nonqualified people from working inside a transformer unless it was “de-energized.” Work inside energized transformers was considered “live line work.” Keener did not mince words on whether a worker like Duran should have been working on an energized transformer. Said Keener: “None of Glover’s people, in my opinion, are qualified to do live line work.” He also testified that Southwest kept the key and wrenches under “lock and key” in the company’s warehouse and that access to the tools was restricted. Furthermore, Southwest had a “pretty firmly set procedure” that if a contractor needed “to work inside the transformer, they would call us and we would send someone out that was qualified.” Q: Who then, at [Southwest] would go out to the transformers and put the PVC pipe under and into the transformer and ran the wire? A: If they called us, and that’s the way it works with other contractors that we use, if they call us, we send somebody out, we will make sure that the conditions are made as safe as possible for our employees that are going to be doing that. If it requires de-energizing the transformer and other people are involved, they may have to reschedule. They may not be able to do it right then when they want to do it, okay? It may require more than a couple of people to be there to make the |1Rwork possible. That’s why we have a procedure that they are supposed to call us before the transformer is opened, if it is energized at all. Q: And, that was the procedure that was in place before this accident? A: Oh, absolutely. The bottom line is that, in Keener’s view, Glover “should have called” Southwest if he needed someone to open the transformers. He also confirmed that Southwest knew when Glover was scheduled to perform the work at the home. Roy FabeR (Southwest constRuction supee-intendent) Southwest construction superintendent Faber brought to his deposition copies of invoices that Glover had submitted to Southwest. Nothing on the invoices indicates whether Glover worked on energized or de-energized transformers. Faber apparently learned — after Duran’s workplace injury — that some of Southwest’s linemen had known that Glover was working on live transformers. In Faber’s words, Glover “shouldn’t have been accessing the transformer. He wasn’t supposed to access the transformer.” Importantly, Faber agreed when asked that Glover’s work was restricted to “digging trenches, laying PVC pipe and, in some instances, pulling wire through” but that Glover’s work did not “mess with live wires, energized wires.” Q: What if anything, did [Southwest] or what was [Southwest] doing in 2009, before this accident, to ensure that when any kind of hot work was being done, it was supervised, by [Southwest]. And, whenever I talk about any kind of hot work, I am talking about the kind of work that is being done by Glover at the time of this accident. [[Image here]] ha A: I am trying to think. If they [Glover] are not supposed to be in the energized transformer, than I guess we are not doing any checking, or making sure. Southwest provided the PVC pipe and wire to Glover from its warehouses in Tex-arkana. Before Glover was given a work order, Southwest would stake out where Glover was to dig the utility trench. As Faber reported, Southwest would put white flags about ten feet apart, including a pin flag, in front of the transformer. The following questions were asked during Faber’s deposition about pulling the wire into a transformer’s interior: Q: But you would come in and at it, underneath it, from the left side? A: I wouldn’t. Q: But, if you are following the flags, and that’s where the flags are, and that’s what they are instructing you to do. And, that is what the flags are used for, right? I don’t want to argue with you about it. A: Right. Q: I just want to make sure we are clear.. You all put those flags out there for a reason? A: Right. . ’ Q: And; they are to be followed? • A: Yes. ■ Todd NewbeRg (Southwest lineman) - .Southwest lineman Todd Newberg testified that it was “standard operating procedure” for a crew foreman and Glover to discuss the work to be done before it was done; and Bobby Fenton was the crew manager who spoke to Gloyer about the work to 12i)be done on the residence in this, case. Newberg also .said that he would sometimes be called to de-energize a transformer that a contractor was scheduled to work on. According to Newberg, though Glover “regularly aqcess[ed]. live transformers,” he didn’t know why Southwest personnel were not' present when Glover accessed live transformers. With critical pieces of this case’s story now in place, we can turn to the- legal decision that the majority opinion has affirmed. The Mistaken SummaRY-Judgment Decision As I mentioned at the beginning, to affirm the summary judgment against Duran-the majority views the record in-the light most favorable- to the wrong party under our standard of review. It then relies on the general rule that one who employs an independent contractor will not be held vicariously liable for the negligent conduct of the independent contractor, because the one who hired the independent contractor has no right to control the manner in which the contractor performs the contract. See Stoltze v. Ark. Valley Elec. Coop. Corp., 354 Ark. 601, 607, 127 S.W.3d 466, 470 (2003) - (noting the general rule and three exceptions). But this case is not a vicarious-liability case; and the rule the majority has applied is a vicarious-liability rule. This is a direct-liability case, because the'focus of the complaint is not on whether Glover acted negligently as to Duran and whether Southwest is liable for Glover’s negligence toward Duran. Here, the complaint’ makes it clear that the legal issue is whether Southwest itself acted as a reasonable power company should under the same or similar circumstances. 121 Under the direct-liability theory that Duran alleges, Southwest may be held liable in tort for its own negligence if it hired Glover to perform an activity that created ■a risk of physical harm and if Southwest retained control over the manner in which Glover performed the hired work. See Restatement, .of Torts (Third) §§ 55-56. Our case law places some limitations on the duty that a hirer may directly owe the employee of its independent contractor, but no case law forecloses Duran’s direct-negligence -theory against Southwest as a matter of law. The circuit court’s ruling that Southwest “owed no duty to provide [Duran] with a safe work environment or to warn him of the dangers of working near an energized transformer, particularly when working near- an energized transformer was an integral part of the work Glover was hired to perform, and where [Duran] was already admittedly aware’of the hazard at issue” is not supported by the record. The majority opinion does not explain why the record, when viewed in Duran’s favor, supports the determination that working near an energized transformer was an integral part of the work Duran’s employer was hired to perform. It cannot. The opposite is true: the, record teems with testimony from Southwest’s own employees who, to their credit, candidly stated that neither Glover nor Duran was qualified to place conduit near an energized transformer. If installing conduit into an energized transformer was not something Glover and Duran were qualified to undertake, then it can’t be an “integral” part of the work that Glover and Duran were hired to perform. To the extent Jackson v. Petit Jean Electric Coop., 270 Ark. 506, 606 S.W.2d 66 (1980), is a direct-liability and vicarious-liability case, it’s distinguishable. There, our supreme court l^held that because (1) an electrical contractor’s employees knew the risks involved in the work, (2) their supervisor “possessed substantial electrical experience,” and (3) the employees were insured against injury by worker’s compensation, they could not hold the electric co-op vicariously liable for injuries they had sustained while working near energized electrical lines. Id. The supreme court also held that the electric co-op owed . no direct duty to provide safety devices or “proper supervision” to the employees because the co-op had not acted to supervise them and the independent contractor’s “compensation and contractual obligations expressly contemplate^] working around energized lines.” Id. at 509, 606 S.W.2d at 68. Jackson makes sense. But that case’s no-duty rule does not control this case for a simple reason that is undisputed in the record: Glover was not an electrical contractor who was qualified to work on energized transformers and neither was his employee Duran; yet that’s what Duran was doing when he was shocked. There is some factual support in the summary-judgment record for the statement that Duran, as the majority reports, “was already admittedly aware of the hazard at issue.” But what he knew about the dangers of what he was doing, when he was doing it, can also be a matter of comparative fault. Southwest has a comparative-fault argument against Duran should the case go forward. But that Duran arguably knew that the transformer was energized and potentially very dangerous does not in and of itself mean that Southwest owed no duty to Duran as a matter of law, especially given the swarm of material facts that Southwest’s employees provided on what it knew (or perhaps should have known) of Glover’s activities, and its decision to limit Glover’s access to transformers after Duran’s injuries occurred. ' Uhe majority holds that Southwest has no possibility of legal responsibility in tort to Duran, based on the written contract Southwest has with Glover, because Southwest retained no control over Glover. The written contract is important. But it’s not dispositive; we must look at all of the important circumstances when asking whether Southwest, retained control over the scope and manner of the work it hired Glover to do. Compare Williams v. Nucor-Yamato Steel Co., 318 Ark. 452, 455, 886 S.W.2d 586, 587 (1994) (holding that summary judgment was appropriate when there was no demonstration of an exercise of actual control and hirer retained no right of control or supervision in the written contract) with Elkins v. Arkla, Inc., 312 Ark. 280, 849 S.W.2d 489 (1993) (reversing summary judgment when there was a genuine issue of material fact concerning the degree to which hirer retained the right to supervise employees of its independent contractor). The majority addresses whether Southwest had a contractual right to control Glover, but it doesn’t discuss evidence of Southwest exercising actual control over Glover’s work. The majority also dismisses Southwest’s employee testimony that Southwest arguably retained some meaningful control over the project by stating that Glover should have called Southwest so that it could send a qualified lineman to access the energized transformer. That Southwest no longer allows Glover to access the transformers that are under lock and key is additional evidence that Southwest retains some manner of control. Southwest told Glover what trenching jobs to do and where to do them. Its engineers staked out the trench’s path to the energized transformer at issue in this case. Southwest’s internal policy required it to supervise and restrict people like Glover (and Duran) from opening energized transformers; only qualified Southwest employees were ^supposed to do that because working near energized transformers is dangerous. Southwest owed a duty to Duran. Whether it breached the duty and proximately caused Duran’s injury are separate questions for another day. Conclusion Given the facts presented in this case, Southwest owed a duty to Duran when he was injured. The circuit court’s decision that Southwest owed no duty to him should therefore be reversed and the case remanded for further proceedings. Kinard, J., joins. . The "Scope of Work" provision in the written contract states,' ■ "Contractor to trench & install conduit or wire to specified depth. Backfill trench & leave to existing grade. Install pedestal, transformer pads and other equipment to specifications,” . By this I mean the majority opinion says that the work order "required Glover to place PVC piping, used as a conduit, in the trench from the residence up to, under, and into the PMT, which was fully energized. Then according to the work order, the final activity .was for Glover to ‘pullf new non-energized electrical lines the length of the conduit.” But the work order states none of these things in black and white. To the extent the majority intends its statement as an inference, the record doesn’t support it when viewed in the correct light. The special-services contract contemplates Glover installing "transformer pads,” but it recites nothing about working near or inside an energized, pad-mounted transformer.